**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TIMOTHY W. SPARROW #358416,** | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 3:17-cv-00717** |
| | ) | |
| **v.** | ) | **JUDGE TRAUGER** |
| | ) | |
| **BLAIR LEIBACH,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

Petitioner Timothy Sparrow, a state prisoner incarcerated in the Trousdale Turner Correctional Center in Hartsville, Tennessee, has filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254, and has been permitted to proceed in forma pauperis. (Doc. Nos. 1, 4.) The court will deny the petition for the reasons explained below.

**I.      FACTS AND PROCEDURAL HISTORY**

The Tennessee Court of Criminal Appeals summarized the relevant trial testimony. (Doc. No. 8-22 at 2–16.)  In the early morning hours of August 18, 2008, the victim, Jose Arias, was in the living room of his friends Thomas Davenport and Kimberly Bennett, with whom he occasionally spent the night. (Doc. No. 8-22 at 2.)  Bennett and Davenport, whose nickname is Bubba, were in their bedroom when they heard a loud vehicle in the driveway. (*Id.* at 2, 4.)  A few minutes later, Arias and the petitioner entered the bedroom, where the petitioner tried to sell Davenport a gun and a CD player, which Davenport declined. (*Id.*)  Both Bennett and Davenport recognized the petitioner, because he had been to the house several times before to buy drugs from Davenport and their other roommate, Marilyn Holt, but they knew him by his alias Larry. (*Id.* at 3, 4.)  He was wearing shorts and a dark shirt. (*Id.* at 4, 5.)

After Davenport refused to purchase the gun or CD player from the petitioner, Arias

turned to leave the bedroom, and the petitioner shot him with the gun he had tried to sell Davenport. (*Id.* at 2.)  Arias continued down the hallway, and the petitioner shot him multiple times. (*Id.*)  Bennett got out of bed to shut the bedroom door and saw Arias and the petitioner down the hall in the kitchen, where the petitioner stood over Arias and shot him in the face. (*Id.*)  Bennett closed the bedroom door, got back into bed and covered her head.  She heard the petitioner come back into the bedroom and say "[G]ive me everything you've got, Bubba." (*Id.*)  Davenport said that he did not have anything, and Davenport heard the gun click. (*Id.* at 2, 5.)  Davenport testified that the petitioner clicked the gun in his face, and he saw a shell casing sticking up from the gun, jamming it. (*Id.* at 5.)  The petitioner then ran out of the house, pushing past Holt, who had been awakened by the sound of the gunshots. (*Id.* at 6–7.)  Holt did not recognize the man, and asked who it was. (*Id.* at 7.)  Bennett told her it was Larry. (*Id.*)  Davenport followed the petitioner and saw that his car was white with a "custom grill" and dark-tinted windows. (*Id.* at 5.)

A sheriff's deputy arrived at the scene at 3:01 a.m. and found Arias to have a pulse, with blood inside his mouth and covering his face, and making gurgling sounds. (*Id.* at 9.)  But by the time EMS arrived, Arias had no pulse, was not breathing, and was unresponsive. (*Id.*)  The medical examiner later determined that Arias had died at the scene. (*Id.*)

At around 5 a.m., the petitioner called Brandy Ray and asked her to pick him up and let him spend the night at her house because he had argued with his girlfriend. (*Id.* at 9.)  When Ray picked him up at a gas station in Shelbyville, he was wearing shorts and a tank top undershirt. (*Id.*)

Also that morning, a Shelbyville police officer received a "BOLO" alert for the white sedan involved in the murder and reported that he saw the sedan and a subject who ran away

from it. (*Id.* at 10.)  The white Crown Victoria belonged to the petitioner's sister and was in the parking lot of Davis Estates, an apartment complex that backed up to the apartment shared by the petitioner, his girlfriend, and his sister. (*Id.* at 11, 14.)  When officers started the car they noticed that it was very loud and seemed to have a muffler that increased the noise, and Davenport and Bennett both said it sounded the same as the car they heard at the time of the shooting. (*Id.* at 11, 13.)

A police dog used to search for the subject in the area around the car alerted to a black t-shirt on the ground near a fence line, which the officers collected. (*Id.* at 10–11.)  Experts later testified that the t-shirt bore a mixture of DNA, with the major contributor being consistent with the petitioner's DNA, and tested positive for gunshot residue. (*Id.* at 13–14.)  The police dog lost the scent of the subject 1.8 miles from where Ray picked up the petitioner that morning.

The petitioner's sister testified that the night before the murder, the petitioner and Tommie Cannon were together in and out of the apartment and traveling in Cannon's car. (Doc. No. 8-22 at 14.)  She testified that the petitioner knocked on her window around 2 or 2:30 a.m. and that she let him in the back door of the apartment. (*Id.* at 14.)  Thirty to sixty minutes later, the petitioner called her and said that he was going to park her white Crown Victoria at Davis Estates, because the police were "after him," and he did not have a driver's license. (*Id.* at 14–15.)  The police arrived at the apartment around twenty minutes later. (*Id.* at 14.)  The petitioner's sister told police that she had not talked to him. (*Id.* at 15.)

Tommie Cannon testified that he was with the petitioner "the night before they said it was supposed to happen or something like that. . . . Might have been the same night." (Doc. No. 8-22 at 15.)  He said they were together in various locations until around 2:30 a.m., and Lakisa Adams testified the two men did visit her apartment together at midnight or 1 a.m. the night

before the petitioner was arrested and stayed over an hour. (*Id.*)

Berry Odem testified that he and Arias went to the residence where the shooting occurred, looking for crack cocaine, around 4 p.m. the previous day and that Arias seemed nervous. Odem left the house at 5:30 or 6:00 p.m. (Doc. No. 8-22 at 15.)

A firearms expert testified for the defense about the possibility of cross-contamination by transfer of gunshot residue to a weapon holster or fabric that comes into contact with a weapon after it is fired. (Doc. No. 8-22 at 16.)

On September 21, 2011, a Williamson County jury found the petitioner guilty of two counts of second degree murder (lesser-included offenses of first degree premeditated murder and felony murder), one count of attempted first degree murder, and one count of attempted aggravated robbery. (Doc. No. 8-2 at 58–62, 64.) On January 6, 2012, the trial court merged the second degree murder convictions and sentenced the petitioner to 20 years in prison for that crime, 20 years for the attempted murder conviction, and 8 years for attempted aggravated robbery. (*Id.* at 104–06.) The sentences for second degree murder and attempted murder were ordered to run consecutively, for a total effective sentence of 40 years. (*Id.*) The Tennessee Court of Criminal Appeals affirmed the petitioner's convictions and sentences on March 14, 2013 (Doc. No. 8-22), and the Tennessee Supreme Court denied discretionary review on August 26, 2013. (Doc. No. 8-25.)

The petitioner filed a pro se post-conviction petition in state court on March 14, 2014. (Doc. No. 8-26 at 55–68.) The court appointed counsel, who filed an amended petition on June 30, 2014. (Doc. No. 8-26 at 74–75, 79–85.) The court held an evidentiary hearing on October 28, 2015, and denied the petition on December 7, 2015. (Doc. No. 28-6 at 102–22.) The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief on September

19, 2016, and the Tennessee Supreme Court again denied review on January 19, 2017. (Doc. Nos. 8-31, 8-34.)

The petitioner's petition for writ of habeas corpus pursuant to Section 2254 is deemed filed in this court on March 20, 2017 (Doc. No. 1 at 14), and the respondent acknowledges that it is timely. (Doc. No. 9 at 2.)

## II.     ISSUES PRESENTED FOR REVIEW

The petition raises the following claims for relief:

1.  The indictment was defective because it did not adequately inform the petitioner of the state's theory of attempted first degree murder. (Doc. No. 1 at 5.)

2.  The petitioner's jury did not fairly represent the community. (Doc. No. 1 at 6.)

3.  The petitioner was unfairly prejudiced by the trial court's evidentiary rulings. (Doc. No. 1 at 8.)

4.  The trial judge engaged in improper communication with the jury. (Doc. No. 1 at 10.)

5.  There was insufficient evidence to support the petitioner's conviction. (Doc. No. 1 at 15.)

6.  The petitioner's sentence was improperly enhanced and is excessive. (Doc. No. 1 at 17.)

7.  The petitioner's right to due process was violated by the cumulative effect of various errors of the trial court and trial counsel, and by prosecutorial misconduct. (Doc. No. 1 at 19.)

8.  The petitioner received ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel. (Doc. No. 1 at 21.)

9.  The petitioner's multiple indictments and convictions for various theories of murder violated his right to due process and the prohibition against double jeopardy. (Doc. No. 1 at 23.)

## III.     STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable

determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate

state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir.

2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## IV.   ANALYSIS

### A. DEFECTIVE INDICTMENT

The petitioner alleges in Claim 1 that:

> The indictment failed to adequately inform the accused of the theory upon which he was to be convicted of the offense [of] Attempted First Degree Murder.  The statute for criminal attempt allows for 3 elements or theories of the offense to be proven.

(Doc. No. 1 at 5.)  The petition acknowledges that this claim was not raised in state court (*id.*), and the respondent asserts that the claim is procedurally defaulted. (Doc. No. 9 at 34–35.)  The petitioner alleges that "[t]his issue was not recognized in prior proceedings due to the ineffective assistance of counsel excusing any procedural default" and asserts generally that *Martinez v. Ryan*, 566 U.S. 1 (2012), supports his position. (Doc. No. 1 at 5; Doc. No. 11.)

The Supreme Court held in *Martinez*, that, in certain circumstances, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," and the Sixth Circuit has held that

this *Martinez* exception applies in Tennessee. *Martinez*, 566 U.S. at 9; *Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014). But the *Martinez* exception is strictly limited to claims of **ineffective assistance of trial counsel**:

> We will assume that the Supreme Court meant exactly what it wrote: "Coleman held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for claims of ineffective assistance of counsel *at trial*."

*Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (quoting *Martinez*, 566 U.S. at 16) (emphasis in *Hodges*). Because the petitioner's Claim 1 is not a claim of ineffective assistance of trial counsel, *Martinez* cannot establish cause for its default.

The petition might be construed to allege that the ineffectiveness of trial counsel or appellate counsel caused the default of Claim 1. But for ineffectiveness of counsel to constitute cause to overcome default, the ineffectiveness claim itself must be exhausted. *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986). The petitioner never raised a claim in state court about ineffectiveness in connection with the indictment, and courts have rejected the notion that *Martinez* might give rise to a "labyrinthine causal chain" that would excuse multiple layers of default in order to resurrect defaulted substantive claims. *See Henderson v. Carpenter*, 21 F. Supp. 3d 927, 935 (W.D. Tenn. 2014) (quoting *Olmos v. Ryan*, No. CV–11–00344–PHX–GMS, 2013 WL 3199831, at *10 (D. Ariz. June 24, 2013)) (holding that petitioner was not entitled to relief under *Martinez* "for procedurally defaulted substantive claims other than ineffective assistance of trial counsel claims").

Accordingly, Claim 1 is defaulted and not subject to federal habeas review.

B.  JURY COMPOSITION

The petition alleges in Claim 2 that the racial profile of the jury pool did not represent "the census of the community," and that the prosecution intentionally discriminated against black

prospective jurors. (Doc. No. 1 at 6.) The respondent asserts that this claim is procedurally defaulted. (Doc. No. 9 at 34.)

The petitioner never raised a substantive claim in state court about the composition of the jury pool itself. He claimed in his petition for state post-conviction relief that counsel had been ineffective for failing to challenge the jury composition (Doc. No. 8-31 at 2), but he did not raise that claim in his post-conviction appeal. (Doc. No. 8-29; Doc. No. 8-31 at 4.) Accordingly, *Martinez* would not apply to this claim, even if it could provide cause for multiple layers of default. *See Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (explaining that *Martinez* does not apply to claims defaulted on post-conviction appeal).

The petitioner did exhaust a claim on direct appeal that the prosecution had dismissed a potential juror on the basis of her race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The state court denied the claim on its merits:

> The appellant argues that the trial court erred by allowing the State to dismiss Juror Garrett, a black female. The appellant contends that the dismissal was not based upon a sufficiently gender-neutral or race-neutral reason.
>
> In *Batson v. Kentucky*, 476 U.S. 79, the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated his right to equal protection under the Fourteenth Amendment to the United States Constitution. In *Powers v. Ohio*, 499 U.S. 400 (1991), the Court eliminated the requirement that the defendant and any wrongfully excluded juror(s) be of the same race. *See State v. Ellison*, 841 S.W.2d 824, 826 (Tenn. 1992). Thus, under *Powers*, a defendant can establish a prima facie case of purposeful discrimination by showing that the prosecution excluded members of a cognizable racial group from the venire. *Id.* To invoke *Batson* protections, a defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender. *See Batson*, 476 U.S. at 94. Once the defendant has presented a prima facie case of purposeful discrimination, the trial court shall require the State to give a race-neutral reason for the challenge. *Id.*
>
> During voir dire, the State used a peremptory challenge to excuse Juror Garrett. The appellant raised a *Batson* challenge, arguing that the appellant was black and so was Juror Garrett. The court asked the State for the reason for dismissing Juror Garrett. The State responded:

It's more with her responses to when people are talking. But there were three different things: One was when I was talking to Mr. Wicks about the higher standards she was always nodding to his responses like she was agreeing to his responses about holding me to a higher standard than reasonable doubt because of the seriousness of this case.

The second reason was that when they were getting into who watches CSI and stuff like that, she watches CSI. And there is going to be a lot of TBI things. She was one of the ones that watches CSI. Which as you know in my experience, particularly with jury trials, that standard is way above any actual reality having to do with TBI or anything that they do, that show. I mean, they do investigations, they can find fingerprints on things that nobody else in the world can find.

There was a third thing and I didn't write it down, but it was something that [defense counsel] was saying that she was agreeing with, nodding her head. Had to do with one of the bias of—it was when she rolls her eye when he was talking about his client not having to testify, and it was something in that area. I didn't write that one down though.

But, I mean, it was—after a while I was getting a horrible feeling about her that she was going to hold me to a higher standard and just bringing stuff up of scientific testimony that I just don't think—that's one lady right next to her, that was the other CSI one. And I just think that that brings in a standard way more than I have to prove.

The State further noted that the race composition of the jury pool did not change because other African–American women remained in the jury pool.

Our supreme court has emphasized that under *Batson*, a trial court "'must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination.'" *State v. Hugueley*, 185 S.W.3d 356, 369 (Tenn. 2006) (quoting *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996)). In the present case, the trial court did not expressly find that the appellant had made out a prima facie case of racial discrimination, yet it required the State to provide a reason for striking Juror Garrett. Therefore, we will proceed on the assumption that the trial court found that a prima facie case was established. *See, e.g., Hugueley*, 185 S.W.3d at 371; *Woodson*, 916 S.W.2d at 905.

The State explained that it struck Juror Garrett based upon her body language, her nodding in agreement with the responses of others about holding the State to a standard higher than beyond a reasonable doubt, and her "avid" watching of the television show CSI. Our supreme court has stated, "If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination." *Hugueley*, 185 S.W.3d at 368 (citing *Batson*, 476 U.S. at 98). The "trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *Id.* (citing *Miller–El v. Dretke*, 545 U.S. 231 (2005)). In this case, the court stated that it did not see Juror Garret nodding but noted that it did not doubt the State's observations. Accordingly, the court found that the State articulated a specific, non-race related reason for excusing Juror Garrett. Further, the court said that Juror Garrett, an African–American woman, was replaced by Juror Johns, who was also an African–American woman. Therefore, the court overruled the appellant's *Batson* challenge. We conclude that the totality of the circumstances do not support a finding of purposeful discrimination and that the trial court properly overruled the appellant's *Batson* challenge.

(Doc. No. 8-22 at 22–24.)

The state court correctly identified the *Batson* standard for federal claims of racially motivated peremptory strikes, and the petitioner does not provide any argument or citations to establish that the state court's application of *Batson* was unreasonable.

The petitioner is not entitled to relief on Claim 2.

## C.  EVIDENTIARY RULINGS

The petitioner alleges in Claim 3 that he was prejudiced by the trial court's erroneous admission of a photograph of the victim, a hearsay statement by Marilyn Holt, and the black t-shirt found on the ground between the car the petitioner was driving the morning of the murder and the location where he was picked up by his friend. (Doc. No. 1 at 8.)  The respondent asserts that this claim raises state-law errors that are not cognizable in a federal habeas action. (Doc. No. 9 at 27.)

The Sixth Circuit has explained that habeas relief is rarely appropriate in connection with

a state court's rulings on the admissibility of evidence:

> With regard to evidentiary rulings, the standard for habeas relief is not easily met. "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)). Even if errors are made in the application of state law, "[such] errors ... especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.), cert. denied, 464 U.S. 962 (1983). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman*, 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id.*

*Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017). Accordingly, the petitioner can only

prevail on this claim by demonstrating a fundamental violation of due process.

The petitioner raised the issue of the photograph on direct appeal, where the Tennessee

Court of Criminal Appeals concluded that the error was harmless:

> On appeal, the appellant appears to argue that the photograph of the victim while alive was irrelevant to any issue at trial, specifically contending that he "does not dispute the cause of the victim's death." He also appears to complain that if the photograph were relevant, it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. The State contends that even if the photograph were irrelevant, the admission of the photograph was harmless.

> During Davenport's direct examination, the State attempted to introduce a photograph of Arias while he was alive. The appellant objected, arguing that the photograph was not relevant. The State responded that the photograph identified Arias. The court overruled the objection, stating that the photograph could be admitted to identify the victim. The appellant then raised a second objection, contending that he had not previously been made aware that the State would

attempt to admit a photograph taken while the victim was alive. The appellant said that case law supported his objection. The parties and the court agreed to resume the discussion the next morning to give defense counsel an opportunity to research the issue.

The following day, Holt testified that she had known Arias for approximately two years. Holt identified the photograph of Arias while he was alive. The State asked for the photograph to be made an exhibit. The court said, "As per the issues noted previously and reserved, the Court accepts this as the next ... exhibit."

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court, and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "'If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; ... the photograph would be cumulative; ... or [the photograph] is gruesome or for some other reason is likely to inflame the jury.'" *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App.1973) (quoting 3 Wharton's Criminal Evidence § 637 (13th ed.)).

We note that our supreme court has previously approved of the admission during trial of a photograph taken while the victim was alive to establish the corpus delecti of the crime and to prove that the "person killed was the same person named in the indictment." *State v. Nesbit*, 978 S.W.2d 872, 902 (Tenn. 1998) (appendix). However, the relevancy of such photographs can be tenuous, or the evidence can be cumulative to other photographs of the victim taken at the crime scene or during autopsy. *See State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006); *State v. Dicks*, 615 S.W.2d 126, 128 (Tenn. 1981). In the instant case, there was no issue about the victim's identity or about his being alive prior to the crime. As such, there was little, if any, relevance to the photograph. Therefore, we conclude that the trial court erred by admitting the photograph. Regardless, we note that the error was harmless. *See, e.g., Young*, 196 S.W.3d at 106–07. Therefore, the appellant is not entitled to any relief on this issue.

(Doc. No. 8-22 at 26–27.)

"[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was

unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119 (2007). The petitioner does not explain how this finding of harmless error was unreasonable or identify any Supreme Court precedent that required a contrary result. He has not demonstrated that a single photograph of the victim before he was shot so inflamed his jury as to fundamentally offend the principles of justice. Accordingly, he is not entitled to relief in connection with the photograph.

The petitioner also exhausted his challenge to Holt's statement on direct appeal:

The appellant complains regarding the admission of Holt's prior statement to police, asserting that it was "self-serving hearsay." In response, the State argues that Holt's statement was not hearsay because it was used only to refresh her recollection and was never admitted into evidence.

At trial, Holt said that she did not recall seeing a gun on the night of the shooting and that she could not recall the race of the perpetrator. The State attempted to show Holt a written statement she gave police. The appellant objected, contending that the statement was "self-serving hearsay." The State clarified that it wanted to use the statement to refresh Holt's recollection. The court allowed the State to use the statement for that purpose. At that point, the State asked Holt if she could recall what she said in her statement about seeing a gun or the race of the perpetrator. She said that she could not. The State asked if seeing the statement would help refresh her recollection. She said that it might because the events were "more vivid" at the time she gave the statement. The State passed Holt the statement, and the court admonished her to read the statement to herself. Nevertheless, Holt read aloud, "I was sleeping and heard what I...." The court stopped her, again cautioning her to read the statement to herself. Holt then read aloud, "I jumped up and there was a tall black guy with a gun...."

The appellant objected, complaining that Holt had read part of the statement aloud. The court overruled the objection. The State then asked Holt if the statement refreshed her recollection, and Holt stated that it did. The State asked for the statement to be introduced for identification purposes only. The court stated, "I don't do the identification thing. I'm going to allow it to be made Exhibit Number 18. And what will happen is it will not be allowed to be shown to the jury. It will be for other purposes only." Thereafter, Holt testified that after reading her statement, she recalled that the perpetrator was black but that she still did not recall whether he had a gun.

Generally, hearsay, which is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is not admissible unless it falls under an exception to the rule against hearsay. Tenn. R. Evid. 801(c), Tenn. R. Evid. 802. However, in the

instant case, the statement itself was not "offered in evidence." Instead, the State used the statement to attempt to refresh Holt's recollection. See Tenn. R. Evid. 612 (stating that while testifying, a witness may use a writing to refresh his or her memory for the purpose of testifying). The use of a statement to refresh recollection under Tennessee Rule of Evidence 612 does not violate the rule against hearsay. *See State v. Mark Walker*, No. M2001–00341–CCA–R3–CD, 2002 WL 1558515, at *11 (Tenn. Crim. App. at Nashville, July 16, 2002). Further, Tennessee Rule of Evidence 803(5) provides that the following items are not excluded by the rule against hearsay:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

In order to justify the use of a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must demonstrate that it is necessary to refresh the witness's memory and that the writing will provide the necessary refreshing. *See State v. Mathis*, 969 S.W.2d 418, 421 (Tenn. Crim. App. 1997). After looking at the statement, Holt was able to independently testify of her own recollection about the race of the perpetrator but not about whether he had a gun. *See State v. Carpenter*, 773 S.W.2d 1, 10 (Tenn. Crim. App. 1989). Therefore, the trial court did not err in allowing the State to use the statement to refresh Holt's recollection.

We note that although Holt was cautioned to read the statement to herself, she read a brief portion of the statement aloud. The appellant argues that the jury could have placed "more emphasis on her recorded, uncross-examined hearsay recollection than her testimony at trial." However, after reading the statement, Holt confirmed that she recalled the perpetrator was black but could not recall him holding a gun. We conclude that any error committed by reading the brief portion of the statement aloud was harmless. See Tenn. R. App. P. 36(b); *State v. Dotson*, 254 S.W.3d 378, 388 (Tenn. 2008).

(Doc. No. 8-22 at 24–25.)

Again, the petitioner does not establish that the state court's determination was unreasonable in any way. Because of the overwhelming evidence against him, including the testimony of two witnesses who were personally acquainted with him, there is no likelihood at all that the jury was swayed by the portions of two sentences that Holt read aloud from her

statement, even assuming that it was error for her to do so.[1]  The petitioner argues for the first

time in this court that the trial court erred by not giving a curative instruction regarding Holt's

statement.  But that particular claim is defaulted, due to his failure to assert it in state court, and

would fail on the merits anyway, for the same reason his primary claim fails: there is simply no

chance that Holt's brief reading from her statement or the failure by the court to instruct the jury

to disregard it had any impact on the outcome of the trial.

Finally, the petitioner argued on direct appeal that the black t-shirt should have been

excluded.  The state court found that he had waived any objection to the t-shirt:

> The appellant challenges the admissibility of the black t-shirt, asserting that the
> State failed to sufficiently establish the chain of custody for the shirt and that
> there was insufficient proof as to the shirt's relevance.  However, as the State
> contends, the appellant failed to contemporaneously object to the admission of the
> t-shirt.  In fact, before the t-shirt was admitted into evidence, the trial court
> specifically asked defense counsel if there was an objection.  Defense counsel
> responded, "No."  Accordingly, the appellant has waived this issue. Tenn. R. App.
> P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring
> relief be granted to a party responsible for an error or who failed to take whatever
> action was reasonably available to prevent or nullify the harmful effect of an
> error").

(Doc. No. 8-22 at 27–28.)  The petitioner's claim for trial-court error in admitting the t-shirt is,

therefore, procedurally defaulted. *See Eblen v. Morgan*, No. 3:05-CV-16, 2008 WL 4057808, at

*8 (E.D. Tenn. Aug. 26, 2008) (Tennessee's contemporaneous objection rule is an adequate and

independent state ground that bars review unless a petitioner demonstrates cause and prejudice).

However, the petitioner exhausted a claim in post-conviction proceedings that trial

counsel was ineffective for failing to object to the admission of the t-shirt. (Doc. No. 8-31 at 4.)

The state court summarized the relevant post-conviction testimony and rejected the ineffective-

assistance claim on its merits:

---

[1] Holt obviously was subject to cross-examination on the entirety of her testimony—what she
initially remembered *and* what she remembered when refreshed.

Trial counsel testified that he "wanted to keep the T-shirt out, but ... that was a tough decision for me." He explained that he "wanted to put the T-shirt in to show that there was no blood on it" and that he "wanted to provide an explanation about ... why there might be gunshot residue." He said that, in an effort to negate the results of the gunshot residue testing, he cross-examined each of the officers who had been involved in the collection and handling of the shirt. In response to counsel's questioning, the officers testified that they had not worn gloves when they collected the shirt, that they did not know what might have been in the collection bag before they put the shirt inside, that they had handled their handcuffs that day, and that they could not recall when they had last cleaned their weapons. Trial counsel employed an expert witness in gunshot residue, David Brundage, who explained to the jury that any of these actions by the law enforcement officers who collected and handled the shirt could have resulted in a transfer of gunshot residue or the same chemicals that make up gunshot residue.

Regarding his desire to admit the t-shirt into evidence, counsel explained that other testimony established that "there was blood everywhere" at the crime scene, including on the walls and on the refrigerator. He said that, given the amount of blood present, there would have been "a high chance" that the shooter would have had blood on his clothing. He said that the fact that the t-shirt had no blood on it worked in the petitioner's favor because counsel was able to argue that "someone that committed this murder would have had blood on them."

Trial counsel testified that he initially asked the trial court to admit the t-shirt for identification purposes only, but the trial court refused. He said that he was faced with a tactical decision at that point because the shirt "cut both ways, because [he] wanted it in to show no blood was on it, but [he] didn't want it in to show it had alleged gunshot residue." He said that by the time he told the trial court that he had no objection to the shirt's being admitted into evidence, "all the testimony" had already "come in about it." Trial counsel denied that his defense would have been stronger had the shirt not been admitted at trial, reiterating that the absence of blood on the shirt suggested that the petitioner "was not, indeed, the shooter." . . .

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief.

*Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," id. (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record supports the ruling of the post-conviction court. Trial counsel's accredited testimony established that although he did not want the t-shirt admitted at trial because it contained gunshot residue, he used the admission of the shirt to his advantage by pointing out that it tested negative for the presence of blood. He explained that photographs and eyewitness testimony established that the crime scene was extremely bloody, making it doubtful that the shooter could have escaped without any blood on his clothes. Regarding the chain of custody, trial counsel thoroughly cross-examined each person involved in the handling of the t-shirt prior to testing, and his questioning established that the shirt had been handled without gloves by officers who had also touched their own guns and handcuffs. The gunshot residue expert employed by trial counsel helped explain how gunshot residue could be transferred via mishandling. Finally, the remaining evidence against the petitioner, which included two credible eyewitness identifications, was overwhelming. Under these circumstances, we cannot conclude that trial counsel's failure to object to the admission of the shirt, even if it could be classified as deficient performance, affected the outcome of the petitioner's trial.

(Doc. No. 8-31 at 3–4, 5–6.)

In his habeas petition, the petitioner categorizes the claim about the t-shirt as a claim about "evidentiary errors and rulings of admissibility," but he also alleges that the "t-shirt should have been objected to by counsel." (Doc. No. 1 at 8.) The court construes this allegation liberally to assert an ineffective-assistance claim, which is exhausted and subject to habeas review.

Even so, the petitioner is not entitled to relief on this claim. The state court correctly identified and reasonably applied the *Strickland* standard for ineffective-assistance claims. Counsel's testimony summarized above demonstrates that he made a strategic decision to allow the t-shirt into evidence in order to emphasize the fact that there was no blood on it, with the hope that he could convince the jury that the gunshot residue had been transferred to the shirt by improper handling by the officers. The ultimate failure of that strategy does not make it objectively deficient. Moreover, the state court correctly concluded that the overwhelming evidence against the petitioner would make any error regarding the t-shirt harmless.

All three prongs of Claim 3 are thus either procedurally defaulted or fail on the merits. The petitioner is not entitled to relief on this claim.

## D. COMMUNICATION WITH THE JURY

The petitioner alleges that the trial judge violated the rule that the jury should receive all instructions directly from the judge on the record and in the presence of all parties. (Doc. No. 1 at 10.) He raised that claim on direct appeal:

> During deliberations, the jury sent the trial court the following question: "should the lesser included second-degree murder be read as second-degree felony murder?" The trial court said that it would inform the jury that the original charge was correct and would not give further instruction. The court said that it would not bring the jury into the courtroom to answer the question. Defense counsel said that he thought the jury should be brought into the courtroom because it would be inappropriate for the judge to speak with the jury in the deliberation room without the parties being present. The court responded that it would have the jury

foreperson come into the courtroom and have him relay the answer to the rest of the jury.

The appellant does not contend that the trial court's answer to the jury question was incorrect. However, he complains about the trial court's method of answering the question. The appellant contends that the entire jury should have been brought into the courtroom for the question to be answered. The State contends that the appellant has waived this issue by failing to contemporaneously object. *See* Tenn. R. App. P. 36(a). Our review of the record reveals that although the appellant expressed displeasure at the idea of the trial court going into the jury room to answer the question, he raised no objection when the trial court brought the jury foreman into the courtroom to receive the answer to the question.

We note that a trial judge has the authority to give supplemental instructions in response to jury questions. *State v. Forbes*, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). This court has previously stated that when giving a supplemental instruction,

> the appropriate course of action for the trial court would have been to bring the jurors back into open court, read the supplemental instruction ... along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions, and then allow the jury to resume its deliberations.

*State v. Bowers*, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001); *see also Spencer v. A–1 Crane Serv.*, 880 S.W.2d 938, 941 (Tenn. 1994); *State v. Mays*, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984). Regardless, we conclude that nothing in the record indicates that the trial court's error in its method of delivering an answer to the jury's question more probably than not affected the judgment in light of the entire record. *See Bowers*, 77 S.W.3d at 791; Tenn. R. App. P. 36(b).

(Doc. No. 8-22 at 28–29.)

The respondent argues that this ruling constitutes the application of the contemporaneous objection rule and that the petitioner's claim is defaulted. (Doc. No. 9 at 36.)  But although the state court reflected the state's contention and the underlying record, it did not "clearly and expressly state[ ] that its judgment rests on a state procedural bar," as required for procedural default to bar habeas review. *Coleman v. Thompson*, 501 U.S. 722, 736 (1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)).  For its ultimate conclusion, it cited substantive case law and the portion of its procedural rule applicable where "relief is available and otherwise appropriate."

*See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

Nevertheless, the petitioner is not entitled to relief, because he has not demonstrated that the state court's determination was contrary to, or an unreasonable application of, federal law. He does not cite any law for the proposition that prejudice should be presumed from the trial court's having the jury foreperson relay the court's refusal to supplement its instructions or assert any reason to believe that he suffered actual prejudice from that procedure.

The petitioner has not demonstrated that he is entitled to relief on Claim 4.

E. INSUFFICIENT EVIDENCE

The petition alleges that the evidence at trial was insufficient to sustain his conviction and constructively amended Count 3 of his indictment for attempted first degree murder. (Doc. No. 1 at 15.) The petitioner exhausted his insufficient-evidence claim on direct appeal, and the Tennessee Court of Criminal Appeals rejected it:

> Next, the appellant challenges the sufficiency of the evidence sustaining his convictions of the second degree murder of Arias, the attempted first degree murder of Davenport, and the aggravated robbery of Davenport. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

> Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the

trier of fact, and not the appellate courts. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Second degree murder is defined as the knowing killing of a victim. *See* Tenn. Code Ann. § 39–13–210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is reasonably certain to cause the result." Tenn. Code Ann. § 39–11–302(b); *see also State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39–13–202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon the following factors to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39–12–101(a)(1)–(3).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or

by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39–13–402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39–13–401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39–14–103.

The proof at trial revealed that the appellant tried to sell Davenport a gun and a CD player before shooting Arias. Davenport and Bennett testified that after the shooting, the appellant burst into Davenport's bedroom, went to Davenport's side of the bed, and demanded, "[G]ive me everything you've got, Bubba." Davenport responded that he did not have anything, the appellant pointed the gun at Davenport, and the gun "click[ed]." Davenport saw that the gun was jammed, and he feared that the appellant would kill everyone in the house. When speaking to police, Davenport, Bennett, and Holt positively identified the appellant as the perpetrator. During a search, police found a recently discarded black tshirt with the appellant's DNA on the collar and gunshot residue on the front.

The appellant asserts that Davenport, Bennett, and Holt were not reliable witnesses because they were admitted crack cocaine users. At trial, Holt testified that she did not use cocaine prior to the shooting, and Davenport and Bennett testified that the crack cocaine they had used was no longer affecting them at the time of the shooting. The appellant complains that the officers who handled the black t-shirt could have contaminated it with gunshot residue from their hands. However, the officers who handled the t-shirt testified that they had not fired their weapons near the time the shirt was discovered and that any chance of contamination was minimal. The appellant contends that the lack of blood on the t-shirt or his shoes suggests that the appellant was not the shooter. Neverthlesss, the jury chose to believe the testimony of Davenport and Bennett that the appellant was the shooter. The jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier [ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that a reasonable jury could have found the appellant guilty of the second degree murder of Arias and of the attempted first degree murder and attempted aggravated robbery of Davenport.

(Doc. No. 8-22 at 20–22.) The respondent asserts that this ruling was reasonable. (Doc. No. 9 at 21–25.)

The state court correctly identified and reasonably applied the *Jackson* standard for

evaluating federal insufficient-evidence claims. The evidence against the petitioner was overwhelming and clearly satisfied the elements of the crimes for which he was convicted. The jury clearly credited the eyewitness testimonies of Bennett and Davenport, which were enough by themselves to establish the petitioner's guilt. Federal law supports the state court's refusal to second-guess the jury's credibility determination:

> In all, these arguments boil down to a challenge to the credibility of these witnesses framed as a challenge to the sufficiency of the evidence. *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). "Attacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." *United States v. Sanchez*, 928 F.2d 1450, 1457 (6th Cir. 1991). We may not reweigh the evidence or assess credibility in determining the sufficiency of the evidence, but must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Salgado*, 250 F.3d at 446.

*United States v. Conatser*, 514 F.3d 508, 518–19 (6th Cir. 2008). The deference due to the state judgment is even greater on habeas review, where reasonable debate about a state court's factual finding "does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). The petitioner has not explained how he thinks the state court's ruling was unreasonable or even identified which element of which crime he believes was not supported by the evidence.

The petitioner's reference to a constructive amendment of the indictment is not supported by any facts regarding the language of the indictment or how the trial evidence failed to conform to it. Moreover, that sub-claim does not appear to have been raised in state court and is, therefore, procedurally defaulted.

The petitioner is not entitled to relief on Claim 5.

F. EXCESSIVE SENTENCE

The petitioner alleges in Claim 6 that the trial court improperly enhanced his sentence,

resulting in a disparately harsh sentence that amounts to cruel and unusual punishment. (Doc. No. 1 at 17.) He asserts several different theories to support this claim, including improper notice of enhancement factors, double jeopardy, and inadequate findings of fact. (*Id.*) The petitioner raised this claim on direct appeal, and the Tennessee Court of Criminal Appeals rejected it:

> The appellant raises several issues regarding sentencing. Specifically, he complains that the State gave insufficient notice of enhancement; therefore, the court erred by finding that he was a multiple Range II offender in regard to his attempted aggravated robbery conviction. He also contends that the length of his sentences is excessive and that the trial court erred by imposing consecutive sentencing.

> Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. *See* Tenn. Code Ann. § 40–35–401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278–79 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* Tenn. Code Ann. §§ 40–35–102, –103, –210; *see also Bise*, 380 S.W.3d at 697–98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40–35–401, Sentencing Comm'n Cmts.

> 1. Notice

> The appellant argues that the trial court erred by finding that the appellant was a multiple, Range II offender for his attempted aggravated robbery conviction because the State's notice was deficient. Prior to trial, the State filed a "Notice of Intent to Use Criminal History and Evidence of Prior Bad Acts." Therein, the State maintained that it was listing the appellant's criminal history to provide

notice for "enhancement of punishment, impeachment, cross-examination, evidence of prior bad acts and any and all other purposes allowed under current law." The notice consisted of approximately seven pages of the appellant's prior criminal history. The notice provided the name of the offense of which the appellant was convicted, the court in which the appellant was convicted, and the date on which the appellant was convicted. However, the notice did not specify the range of punishment sought or which convictions were the felonies to be used to support the range enhancement.

On October 12, 2011, the appellant filed a "Motion to Strike Sentencing Enhancement of the Defendant Sparrow," arguing that the notice was insufficient. Specifically, the appellant complained that the "'multi-tasking' Notice of Intent to Use Criminal History and Evidence of Prior Bad Acts[ ] does not advise the [appellant] of what status the State asserts for the [appellant] at Sentencing." On November 29, 2011, the trial court denied the appellant's motion, stating that after a hearing had been held on the matter, the court found the notice to be sufficient. The court further stated that "the State was ordered to give a copy of the [appellant's] certified priors and Pen. Pack to the [appellant]." The "Pen. Pack" is included as an exhibit to the sentencing hearing, which was held on January 4, 2012. The packet contains copies of the appellant's judgments of conviction.

Tennessee Code Annotated section 40–35–202(a) provides:

> If the district attorney general believes that a defendant should be sentenced as a multiple ... offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement ... must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions.

*See also* Tenn. R. Crim. P. 12.3(a) ("Written statements of the district attorney giving notice that the defendant should be sentenced to an enhanced punishment ... shall be filed not less than ten (10) days prior to trial. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial.").

"The purpose of the statutory notice of intent to seek enhanced sentencing is to (a) provide fair notice to an accused that he/she is exposed to other than standard sentencing, (b) to facilitate plea bargaining, (c) to enable the accused to make an informed decision before entering a guilty plea, and (d) to a certain extent, to aid in trial strategy." *State v. Livingston*, 197 S.W.3d 710, 713–14 (Tenn. 2006). Generally, "when the State has substantially complied with [Tennessee Code Annotated section] 40–35–202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990).

We conclude that the State substantially complied with Tennessee Code Annotated section 40–35–202(a) because the notice "contains the State's express intent 'to seek enhanced punishment,' sets forth the nature of the prior felony convictions, the dates, and the identity of the courts of the convictions, and was filed months in advance of the trial and sentencing hearing." *State v. Taylor*, 63 S.W.3d 400, 413 (Tenn. Crim. App. 2001). Moreover, after a hearing on the issue, the appellant was supplied with the "Pen. Pack," giving him actual notice of the offenses that would be used to enhance his sentence. As our supreme court has explained:

> While "perfect" notice is not required, ... we have strictly applied the requirement of section 40–35–202(a) that some notice meeting the minimal requirements of the statute be given....

> To reiterate, the notice provision of Tenn.Code Ann. § 40–35–202(a) requires, at a minimum, that the State file: (1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity of the courts of the convictions.

*Livingston*, 197 S.W.3d at 713–14 (footnote omitted).

The record establishes the notice reflected, in pertinent part, that the appellant had prior convictions of forgery up to $1,000, a Class E felony and of selling less than .5 grams of cocaine, a Class C felony. Thus, he had notice of the offenses being used to enhance his sentence. After applying the convictions to his instant conviction of attempted aggravated robbery, a Class C felony, the appellant was properly classified as a Range II offender. See Tenn. Code Ann. § 40–35–106(a)(1). Therefore, we conclude that the appellant is not entitled to relief on this issue.

## 2. Length of Sentence

The appellant argues that the length of his sentences is excessive. He specifically contends that the trial court erred in failing to apply mitigating factors and in weighing the enhancement factors and mitigating factors.

At the sentencing hearing, Arias's oldest brother, Renee Arias, testified that the victim was forty-four years old at the time of his death. He said that he and the victim were from Cuba and that they were close. He said that the victim was hardworking, gentle, funny, happy, and a good father. He stated that his family blamed him for the victim's death.

Bennett testified that the victim was a friendly, wonderful person. She stated that she thought the appellant intended to kill everyone in the house, saying "I really and truly believe with all my heart if there had been any more bullets in that gun we would have all been killed." She said that she had trouble sleeping and that she suffered from anxiety about being in the house alone. She maintained that she had been though counseling after the incident. She stated that she had been a crack

cocaine addict but that she had not used drugs since the shooting.

Ralph H. Buddy Peden, who was a retired food business sales executive, testified that he was a recovering alcoholic and that he went to the Williamson County Jail every Thursday for an Alcoholics Anonymous meeting with the inmates. He stated that for two years, the appellant had been actively participating in the meetings. He said that the appellant was an outspoken leader and talked about "the error of his ways." Peden believed that the appellant had made a major change in his life.

Charles Edward Gospodarek, a retired systems administrator for Hartford Insurance, testified that he was active in sponsoring people in drug recovery, including at the Williamson County Jail and the Easley Criminal Justice Center. He stated that for two or three years, the appellant had participated in the Alcoholics Anonymous meetings. Gospodarek stated that at first, the appellant was quiet. Then, he began talking about his issues. Gospodarek said that the appellant had benefitted from his participation in the meetings and that other inmates had benefitted from the appellant, as well.

Correctional Officer Lance John Dorman testified that he worked the area in which the appellant was housed and that he had few problems with the area. He stated that the appellant was not a disruptive inmate.

Correctional Officer James Hamner Gillam testified that he worked the area in which the appellant was housed and that the appellant was a respectful, nondisruptive inmate.

In the presentence report, the appellant described his family history as having its "ups and downs." He explained that his mother was addicted to drugs and frequently changed addresses. He said that he and his sisters "were passed from house to house among relatives." He acknowledged that he was "a 'problem child.'" He stated that while his sisters continued to live with relatives, he was placed in foster care.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114.

Tenn. Code Ann. § 40–35–210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40–35–

114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Id.* at 345–46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections –102 and –103 of the Sentencing Act." *Id.* at 346.

The appellant was convicted of second degree murder, a Class A felony; attempted first degree murder, a Class A felony; and attempted aggravated robbery, a Class C felony. As a standard, Range I offender, he was subject to a sentence between fifteen to twenty years for each Class A felony conviction. Tenn. Code Ann. § 40–35–112(a)(1). As a multiple, Range II offender, he was subject to a sentence between six and ten years for the Class C felony conviction. Tenn. Code Ann. § 40–35–112(b)(3). The trial court sentenced the appellant to twenty years for each of his Class A felony convictions and to eight years for his attempted aggravated robbery conviction.

The trial court found the following enhancement factors: (1) that the appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (7) that the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement; (9) that the appellant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; (10) that the appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40–35–114(1), (7), (9), and (10).

With regard to enhancement factor (1), the trial court noted that the appellant had a history of multiple criminal convictions. Tenn. Code Ann. § 40–35–114(1). The appellant, who was twenty-seven years old, had approximately fifty-five prior convictions. Therefore, this enhancement factor was applicable.

With regard to enhancement factor (7), the trial court said that "there could be an argument made that the [appellant] obviously came in for the purposes of obtaining drugs for—and that would be to gratify a desire for pleasure, but I don't put much weight on that. I don't think it's necessarily appropriately applied, but it certainly is a factor that the Court could consider." Tenn. Code Ann. § 40–35–114(7). We can find nothing in the record to support the application of this enhancement factor.

With regard to enhancement factor (9), the court applied it to the second degree murder and attempted murder convictions. Tenn. Code Ann. § 40–35–114(9). However, the court stated that it would not afford the enhancement factor much weight. Because the use of a weapon is not an element of second degree murder

or attempted first degree murder, the trial court was entitled to use this enhancement factor to enhance the sentence for those convictions.

With regard to enhancement factor (10), the court found that the appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40–35–114(10). However, the court stated, "I think that is anticipated by the statutes and is not necessarily applied as an enhancement factor." Because enhancement factor (10) is inherent in the offenses for which the appellant was convicted, the trial court was correct in stating that enhancement factor (10) should not be applied. *See State v. Robert Jesus Porrata*, No. W2011–00749–CCA–R3–CD, 2012 WL 5199693, at *6 (Tenn. Crim. App. at Jackson, Oct. 22, 2012).

The court found that mitigating factor (6), that the appellant, because of youth or old age, lacked substantial judgment in committing the offense, did not apply. The trial court stated that the appellant was twenty-four years old at the time of the offense, "I don't believe there's any evidence that his maturity level was so low that that mitigating factor should be applied here."

The trial court also found under enhancement factor (13), that the appellant's "background does not have any offenses where violence was used to precipitate any type of criminal activity." Additionally, the court found that the appellant had family support and that he was well behaved in jail.

The appellant does not complain about the application of any of the enhancement or mitigating factors. His only complaint is about the weight attributed to the factors. Specifically, the appellant argues that the trial court should have attributed more weight to the mitigating factors, particularly his difficult childhood and his good behavior in jail. However, this court does not reweigh mitigating and enhancement factors. *See Carter*, 254 S.W.3d at 345. Therefore, this issue is without merit.

### 3. Consecutive Sentencing

The appellant argues that the trial court erred by ordering that the sentences be served consecutively. Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." *State v. Adams*, 973 S.W.2d 224, 230–31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40–35–115(b) contains the discretionary criteria for imposing consecutive sentencing. *See also State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria. In the instant case, the trial court found criterion (2), that the appellant was an offender whose record of criminal activity was extensive. Tenn. Code Ann. § 40–35–115(b)(2). The court noted that, even at the appellant's relatively young age, he had an extensive criminal history and had committed an offense "pretty much every year since the age of majority." The appellant's presentence report reflects that as an adult, the appellant had been convicted of: two counts of felony forgery up to $1,000; two counts of felony possession of less than .5 grams of cocaine; thirty-

nine counts of misdemeanor theft; misdemeanor failure to appear; misdemeanor conspiracy to distribute drugs; driving while his license was suspended; driving on a revoked license; possession of a weapon with the intent to go armed; and traffic offenses. Additionally, the presentence report reflects that the appellant has violated probation or parole on four occasions. Therefore, the record supports the conclusion that the appellant has an extensive criminal history.

The trial court also found that the appellant's behavior reflected that he "had no hesitation in committing a crime in which the risk to human life was high." Without specifically stating so, the court essentially found that the appellant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40–35–115(4). Generally, in order to find that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" *State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting *Wilkerson*, 905 S.W.2d at 938); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The court stated that the instant crimes were "egregious." Specifically, the court stated that the appellant went into someone's home as an invited guest; shot Arias multiple times without provocation, including shooting Arias in the back; then the appellant committed further criminal acts by attempting to rob and shoot Davenport. The court found that, "obviously, [the appellant] has no regard or at least had no regard on this evening of the sanctity of human life and, quite frankly, I don't find that he has much regard for it now." The court said, "Certainly, this Court could look at his record and say that the— that the community would not be safer having him on the streets as the community would having him locked up based upon the number of criminal offenses he's had in his fairly young life." We conclude that the trial court did not err by imposing consecutive sentencing based upon the appellant being a dangerous offender.

## I. Double Jeopardy

Finally, the appellant raises multiple double jeopardy arguments. The double jeopardy clauses of the United States and Tennessee constitutions protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. *State v. Watkins*, 362 S.W.3d 530, 548 (Tenn. 2012). Recently, in *Watkins*, our supreme court opted to rely upon a two-step test based upon *Blockburger* to determine when double jeopardy attached. Id. at 556–57. Our supreme court stated that courts must "first consider whether the defendant's dual convictions arose from the same act or transaction." *Id.* at 558. The second step of the test "requires courts to examine the statutory elements of the offenses." *Id.* at 557. Generally,

> [i]f the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple

> convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

*Id.* (footnote omitted).

First, the appellant argues that he should not have been sentenced for both second degree murder convictions. However, the record reflects that the second degree murder convictions were merged; therefore, the principles against double jeopardy were not violated.

Next, he contends that his

> attempted aggravated robbery conviction stems from his act of attempting [to take] the victims or occupants' property. And the attempted murder conviction arose from the [appellant's] attempt to put the victims and occupants of the attempted robbery in fear. The aggravated robbery statute obviously exists to prohibit a person from forcibly taking property from another by using a deadly weapon or causing serious bodily injury. The threat of murder is very persuasive in convincing others to give up their property. In our case, thus, the evidence relied on by the State is the same for all the convictions, a continuous criminal episode.

The appellant's second degree murder conviction stemmed from the shooting of Arias. His attempted first degree murder conviction stemmed from his unsuccessful attempt to shoot Davenport. His attempted aggravated robbery conviction stemmed from his pointing a gun at Davenport and demanding "everything you've got." None of the offenses are statutorily the "same offense" for double jeopardy purposes. Accordingly, this issue is without merit.

(Doc. No. 8-22 at 30–39.)

To whatever extent the petitioner's Claim 6 is intended to raise issues that were not exhausted by the state court's ruling on direct appeal,[2] the claim is procedurally defaulted and not subject to further review. With regard to the issues that were raised and determined in state court, the petitioner has not demonstrated that the state court's determination was contrary to or an unreasonable application of any clearly established federal law. Absent evidence that a

---

[2] *See* Doc. No. 1 at 17, asserting that "[s]ome facts relating to this issue were raised but others were not recognized by counsel."

petitioner's sentence exceeded the statutory maximum for his crime, the length of his sentence is typically not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373–74 (1982); *Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000).  The petitioner's sentences were within the statutory ranges for his offenses, and the state court reasonably found that the petitioner's 55 prior convictions satisfied the criterion of extensive criminal history warranting the imposition of consecutive sentencing.  The state court also carefully examined every basis for the enhancement of the petitioner's sentences and reasonably found the enhancements warranted under the circumstances.  And it reasonably found that, having had a full hearing on the matter, the petitioner had adequate notice of the enhancement sought for his criminal history and that each of his three convictions was for a separate offense and did not constitute a double jeopardy violation.  In the absence of any federal law dictating against any of those determinations, they cannot be the basis for relief under AEDPA.

## G.  CUMULATIVE ERROR

Claim 7 of the petition presents a mixed bag of unrelated claims culminating in an assertion of "cumulative errors." (Doc. No. 1 at 19.)  This claim fails for at least two reasons.  First, cumulative-error claims are not cognizable on habeas review because the Supreme Court has never held that cumulative errors may form the basis for issuance of a writ of habeas corpus.  *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  And second, the petitioner acknowledges that he did not raise any cumulative-error claim in state court (Doc. No. 1 at 19), which renders his current claim procedurally defaulted and not subject to habeas review.

## H.  INEFFECTIVE ASSISTANCE

The petitioner alleges in Claim 8 that his counsel was ineffective in the following 17

ways:

1. Advising the petitioner not to testify at trial;

2. Providing deficient advice regarding plea agreement and sentencing exposure;

3. Failing to investigate the facts and law;

4. Failing to object to evidence;

5. Failing to contest the validity of the indictment;

6. Failing to object to sentencing errors;

7. Failing to raise sentencing errors in post-judgment motion or appeal;

8. Failing to raise meritorious issues on appeal;

9. Failing to preserve issues for appellate review by objecting;

10. Failing to request favorable jury instructions regarding drug use by witnesses;

11. Failing to effectively cross-examine and impeach witnesses;

12. Failing to challenge venue;

13. Failing to present alibi defense;

14. Failing to challenge the validity of merged convictions;

15. Failing to obtain and present expert testimony on firearms, blood, identification, and t-shirt;

16. Failing to present evidence during post-conviction hearing;

17. Failing to preserve and present issues for appellate review in post-conviction.

(Doc. No. 1 at 21.)

The only ineffective-assistance claim that the petitioner exhausted in his post-conviction appeal was the claim that counsel was ineffective for failing to object to the admission of the black t-shirt. (Doc. No. 8-31 at 4.)  That claim, reasserted here as sub-claim 8.9, fails on its merits because the state court's rejection of it did not amount to an unreasonable application of *Strickland*, for the reasons explained above in connection with Claim 3.

As the respondent correctly asserts, the rest of the sub-claims presented in Claim 8 are procedurally defaulted. (Doc. No. 9 at 37.)  The petitioner asserts that he can overcome these defaults pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (Doc. No. 11.)

The Supreme Court held in *Martinez* that, in certain circumstances, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," and the Sixth Circuit has held that this *Martinez* exception applies in Tennessee. *Martinez*, 566 U.S. at 9; *Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014). To overcome default under *Martinez*, a petitioner must show that post-conviction counsel was ineffective during the "initial-review collateral proceeding," *Martinez*, 566 U.S. at 16, and that the underlying ineffective-assistance-of-trial-counsel [IATC] claim is a "substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 14. *Martinez* does not apply to claims that were raised in a post-conviction petition but defaulted on post-conviction appeal, because those defaults cannot be attributed to ineffectiveness during the initial-review post-conviction proceeding. *West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015).

The petitioner raised sub-claims 8.1, 8.4, 8.6, 8.11, 8.12, and 8.13 in his pro se post-conviction petition[3] (Doc. No. 8-26 at 59, 66–68), but did not raise them in his post-conviction appeal. (Doc. No. 8-29.) Accordingly, *Martinez* does not apply to these sub-claims. Because the petitioner has not offered any other basis to excuse their default, these sub-claims are not subject to further review.

Sub-claims 8.7, 8.8, 8.16, and 8.17 allege ineffectiveness in post-trial proceedings, appeal, and post-conviction. Ineffective assistance of counsel during post-conviction proceedings does not raise a cognizable habeas claim, because there is no constitutional right to effective counsel at post-conviction. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a

---

[3] The amended post-conviction petition filed by counsel fully incorporated the original pro se petition. (Doc. No. 8-26 at 79.)

petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted). Sub-claims 8.16 and 8.17, therefore, do not state viable claims for habeas relief. Moreover, because *Martinez* is strictly limited to claims of ineffective assistance at trial, it does not apply to these sub-claims. *See Davila v. Davis*, 137 S. Ct. 2058, 2065–66 (2017) (holding that *Martinez* does not apply to claims of ineffective assistance of counsel on appeal, because it "qualifie[d] *Coleman* by recognizing a narrow exception" that applies only to claims of "ineffective assistance of counsel at trial"). Because the petitioner has not asserted any other basis for excusing the default of sub-claims 8.7 or 8.8, those claims are not subject to further review.

The court will review the petitioner's remaining Claim 8 sub-claims to see whether they satisfy *Martinez*. For the purposes of *Martinez*, "[a] substantial claim is one that has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). On the other hand, a claim is not substantial "when 'it does not have any merit,'" or when it "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16).

The petitioner has not provided any support for any of his remaining sub-claims. He complains about counsel's advice regarding a potential plea agreement and sentencing exposure (sub-claim 8.2), but he does not allege what advice counsel gave him, how it was defective, or whether he would have accepted a plea agreement if not for the deficient advice. He alleges that counsel failed to investigate the facts and law (sub-claim 8.3), but he does not specify what facts or law counsel should have discovered through proper investigation, or how he would have benefitted from such discovery at trial. He faults counsel for not obtaining and presenting expert testimony on firearms, blood, identification, and the t-shirt (sub-claim 8.15), but he does not

offer any information about the potential substance of such testimony or how it would have benefitted him at trial. To prevail on a claim that counsel was ineffective for failing to develop and present evidence, he must present at least a summary of the evidence in order to demonstrate a reasonable probability that it would have produced a different outcome. *See Hutchison v. Bell*, 303 F.3d 720, 748–749 (6th Cir. 2002) (noting that "a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material"). The absence of any facts to support these sub-claims prevents them from being substantial for the purposes of *Martinez*.

The relevant portions of the record further doom several of the petitioner's sub-claims. For example, the petitioner asserts that counsel should have contested the validity of the indictment (sub-claim 8.5), and the court presumes he bases this claim on the same alleged defect in the indictment raised in Claim 1—that it "failed to adequately inform the accused of the theory upon which he was to be convicted of the offense [of] Attempted First Degree Murder" when "[t]he statute for criminal attempt allows for 3 elements or theories of the offense to be proven." (Doc. No. 1 at 5.) The petitioner's indictment for that offense alleged that he had "intentionally, deliberately and with premeditation attempt[ed] to kill Thomas Davenport," in violation of the applicable statutes (Doc. No. 8-1 at 15), and he knew from at least the time of the September 26, 2008 preliminary hearing—approximately three years before his trial—that the state's evidence would be that he had pointed a gun at Davenport and "clicked" the gun, which had a shell hung in it and failed to fire. (Doc. No. 8-4 at 10.) The petitioner does not explain how, in light of the clear language of the indictment and his advance knowledge of the evidence against him, he was prejudiced by any alleged lack of notice of the charge against him.

The petitioner also complains that counsel should have requested favorable jury instructions regarding drug use by the state's witnesses (sub-claim 8.10), but he does not set forth the instruction he thinks should have been given or explain how he was prejudiced by its absence. The trial court instructed the jurors that they were "the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony," and that in making that judgment they could rely on "the proof, if any, of the witness' [sic] general character, the evidence, if any, of the witness' reputation for truth and veracity, the intelligence and respectability of the witness, . . . the witness' means of knowledge, . . . and all the evidence in the case tending to corroborate or contradict the witness." (Doc. No. 8-2 at 11.) Both Bennett and Davenport admitted on cross-examination that they had smoked crack cocaine the night before the murder, and counsel forced Bennett to admit that she was addicted to crack cocaine at the time of the crimes. (Doc. No. 8-22 at 3, 6.) Counsel asked them whether the crack had affected their memory or senses during the incident, which they both denied. (Doc. No. 8-7 at 56–57, 139–40.) The instruction the trial court gave about witness credibility was not specifically tailored to drug use, but it was broad enough for the jury to consider the witnesses' potentially impaired recollection of events. In light of the fact that other evidence corroborated Bennett and Davenport's testimony, the petitioner has not established any likelihood that the outcome of his trial would have been different if the jury had heard a special instruction about drug use by witnesses.

Finally, the petitioner complains that counsel failed to challenge the validity of merged convictions (sub-claim 8.14), but does not explain why he thinks the merger was invalid or how he was prejudiced by it. The jury convicted the petitioner of second degree murder for Arias's killing on two different theories, and the trial court merged those convictions into one and

41

imposed a single sentence. (Doc. No. 8-2 at 104.) When a trial court finds that a jury has reached "convictions [that] are duplicitous or multiplicitous and therefore in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, the court may 'merge' the convictions in the sense of vacating the duplicitous or multiplicitous convictions." *United States v. Tocco*, 306 F.3d 279, 289 n.12 (6th Cir. 2002) (citing *United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir.1990)). The merger was thus to the petitioner's benefit, and counsel was not ineffective for not challenging it.

Because the state court's rejection of sub-claim 8.9 was not unreasonable, and the rest of the sub-claims of Claim 8 are procedurally defaulted and not sufficiently substantial to merit further review pursuant to *Martinez*, the petitioner is not entitled to relief on Claim 8.

I.   DUE PROCESS AND DOUBLE JEOPARDY

The petitioner alleges in Claim 9 that "multiplicitous and duplicitous indictment" violated his rights. Specifically, he asserts:

> Ct 1 charged Pre-Meditated Murder and Ct 2 charged Felony Murder — jury found guilty of both counts in the lesser second degree and merged convictions on a single judgment form. Ct 3 charged Attempted First Degree Murder without electing the theory within the statute charging with 3 offenses within one charge.

(Doc. No. 1 at 23.) The portion of this claim related to the petitioner's double jeopardy concerns about his convictions for premeditated murder and felony murder are without merit for the reasons explained in connection with Claim 6. The latter portion of this claim, related to the petitioner's indictment in Count 3 for attempted first degree murder, is procedurally defaulted and not subject to further review for the reasons set forth above in connection with Claims 1 and 8.5. Accordingly, the petitioner is not entitled to relief on Claim 9.

## V.    CONCLUSION

For the foregoing reasons, the petitioner is not entitled to relief on any of his claims.

Accordingly, the court will deny the requested relief and dismiss the petition.

An appropriate order shall enter.

ENTER this 12th day of September 2018.

ALETA A. TRAUGER
United States District Judge